UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------x

PAUL (CHAIM SHLOMO) FISCHER,
AHARON (ALEX) FISCHER, ISACHAR
DOV FISCHER, ISRAEL FISCHER,
ESTATE OF SIMCHA YEHUDA
YESHA'AYAU FISCHER and
ESTATE OF ABRAHAM GABI
GABOR FISCHER,

**CV 12 - 3328**

**COMPLAINT**

**KUNTZ, J.**

Plaintiffs,

v.

Trial By Jury Demanded

ERSTE GROUP BANK AG a/k/a Erste
Bank der Oesterreichischen Sparkassen
AG, Erste Bank Oesterreich or Erste
Bank Austria ("Erste"), BAYERISCHE
LANDESBANK a/k/a BayernLB or
Bavarian State Bank, MKB BANK Zrt.
("MKB") and MAGYAR NEMZETI
BANK,

**REYES, M.J.**

**SUMMONS ISSUED**

Defendants.

------------------------------------------------x

Plaintiffs, who are all members of the Fischer family and victims of the Hungarian

Holocaust or their heirs, bring this action individually and on behalf of the entire Fischer family

for an accounting and to recover cash, records, art, jewelry, bank deposits, instruments,

securities, mortgaged buildings and properties, and all other business, real estate records and

personal assets stored for safekeeping in bank safe deposit boxes and bank accounts that were

wrongfully taken and withheld from them and their family ("Looted Assets") by the defendant

banks during the occupation by Hungary of that area of Yugoslavia (*e.g.* Backa Province,

Vojvodina) annexed by Hungary in 1941 and which is today part of Serbia, and which assets

continue to be wrongfully withheld, unaccounted for and unreturned.

Plaintiffs seek both legal and equitable relief, including a full accounting, disclosure, disgorgement and restitution by the defendant banks named herein for their aiding and abetting and participation in a conspiracy with others to commit genocide, war crimes and crimes against humanity during World War II through the unlawful taking and retention of Looted Assets of the Fischer family in Greater Hungary.

<u>**THE PARTIES**</u>

<u>**Plaintiffs**</u>

1.      Plaintiff **Dr. Paul (Chaim Shlomo) Fischer** was born in Petrovo Selo (Peterreve) then Yugoslavia, in May 1936. He is now a United States citizen, and resides at 1645 45th Street, Brooklyn, New York 11204.

2.      Plaintiff **Aharon (Alex) Fischer**, a brother of Plaintiff Paul Fischer and one of six sons of the late Matyas Fischer and his wife, Irma Chaya Sheindl Fischer (nee Holender), is a citizen of the United States, residing at 1548 49th Street, Brooklyn, New York.

3.      Plaintiff **Isachar Dov Fischer**, another one of the brothers, is now a citizen of Israel, residing at 2 Itzik Manger Street, Tel-Aviv, Israel.

4.      Plaintiff **Israel Fischer**, another one of the brothers, is now a citizen of Israel, residing at 53 Hanasi Street, Givat Shmuel, Israel.

5.      The **Estate of Dr. Simcha Yehuda Yesha'ayau Fischer**, another brother, who is deceased, is represented by his son, Israel Fischer.

6.      The **Estate of Abraham Gabi Gabor Fischer**, another brother who is deceased, is represented by his daughter, Tamara Fischer.

7.      Plaintiffs' father, Matyas Fischer, who did not survive the Holocaust and died, upon information and belief, in a concentration camp, was born in Peterreve (then part of

the Austro-Hungarian Empire) on July 12, 1895. He completed his advanced studies in economics and concluded his apprenticeship in Cegled, Hungary. Immediately afterwards, in 1915, he served with merit in the Austrian-Hungarian army, and was discharged from the army in 1918 due to a physical handicap. At the time of his discharge, he held the rank of captain, and was awarded a medal commemorating his meritorious military service.

8.     Plaintiffs' father received a very large dowry from his wife's family upon their marriage, and inherited from his family a great deal of farmland in the vicinity of Peterreve, Ada and Obecse. He was widely known in the region as being a wealthy individual, and his land was leased primarily to farmers who paid for the lease with a portion of their crops. Some of the land was also cultivated by salaried farmers, and the crops that were harvested – including grains such as barley, wheat and corn --were sold all over Europe and Scandinavia.

9.     Plaintiffs' father also owned and managed a bank in Peterreve, known from 1941 as the "Peterreve Hitelbank" (formerly known as the "Petroselska Kreditna Banka"). This bank, which is located at 8 M. Tito Street (formerly 9 King Aleksandar Street), was established by Matyas Fischer in 1923 as a branch of the "Novosadska Stedionica," also referred to as "the Ujvideki Hitelbank," and later renamed for a short period as "Trgovacha I Obrtna Banka D.D. Novi Sad." Plaintiffs' father maintained both private family accounts and business accounts with both of these banks, which are now part of defendant **Erste Bank Group**.

10.     Following the Hungarian occupation, Plaintiffs' father was removed as manager of his bank in May 1941 when the Hungarian anti-semitic laws began to be enforced in

3

the area, prohibiting Jews from working in certain occupations, such as managerial bank positions. A non-Jewish "aladar" strawman was placed in his stead, which was typical throughout Trianon Hungary since 1939. Plaintiffs' father's other business activities were also severely curtailed, as he could not lease his land or export his crops, and was prohibited from travelling abroad. His resources and income were thus sharply diminished, and at the onset of the winter of 1942, it was extremely difficult for Plaintiffs' father to access his accounts in Ujvidek due to the constant danger there to Jews.

11.    Plaintiffs' father also had a safe deposit box containing foreign currency, gold and diamonds in safe (number 7A) at the Pesti Hazai Elso Takarekpenztar Bank in Budapest, which is now part of defendant **Erste Group Bank**. The dimensions of the safe were 50 x 25 x15 cm., and mostly contained diamonds and gold coins (kronen), with a value of $18 million USD.

12.    Plaintiffs' father had decided during the 1930s that, due to the economic instability and currency restrictions following the 1929 stock market crash and Depression, to convert most of his cash into diamonds, gold and other valuables. Upon information and belief, after Plaintiffs' father was deported in 1944, custody of the safe deposit box that Plaintiffs' father had maintained at the Pesti Hazai Elso Takarekpenztar Bank in Budapest was transferred to the Pesti Magyar Kereskedelmi Bank, which later became the Bayerische Landesbank Muchen, now part of defendant **Bayerische Landesbank a/k/a BayernLB or Bavarian State Bank** and/or its subsidiary, **MKB Bank Zrt.** (collectively referred to as "**MKB**").

4

**Defendants**

13.     Defendant **Erste Group Bank AG ("Erste")**, which has been publicly owned since 1997, is one of the largest banks and financial services providers in Central and Eastern Europe. It has more than 50,000 employees and has branches serving 17 million customers in eight countries, including Austria, Czech Republic, Slovakia, Romania, Hungary, Croatia, Serbia (Petrovo Selo, Erste Vodvodina) and Ukraine. In 1993, the banking operations of "DIE ERSTE Oesterreichisch Spar-Casse" were transferred to a public limited company and newly founded operational subsidiary named DIE ERSTE Osterreichische Spar-Casse-Bank AG ("Die Erste"). On June 27, 1997, Die Erste was merged with GiroCredit through the absorption of GiroCredit into Die Erste. Also in 1997, Die Erste was renamed "**Erste Bank der Oesterreichischen Sparkassen AG**," and is also known as "Erste Bank Oesterreichischen" or "Erste Bank Austria." **Erste** operates in Hungary through its subsidiary, "Erste Bank Hungary Zrt." In December 1997, Erste Bank went public on the Vienna Stock Exchange, and is now also traded on the Prague and Bucharest Stock Exchanges. As set forth in paragraphs 9 and 10 above, Defendant **Erste** acquired ownership and/or control of certain Hungarian banks where plaintiffs' father maintained his bank accounts and safe deposit box.

14.     Defendant **Bayerische Landesbank, a/k/a BayernLB or Bavarian State Bank, ("Bayerische")**, has 19,200 employees and is one of the eight largest financial institutions based in Germany. **Bayerishe** has subsidiaries in Germany, Hungary, Romania, Austria and Bulgaria. The name of its subsidiary in Hungary is **MKB Bank Zrt** (formerly "Magyar Kulkereskedelmi Bank"). Bayerische and its subsidiary, MKB Bank Zrt., are collectively referred to as "**MKB.**" As set forth in paragraph 12 above,

**MKB** acquired ownership and/or control of certain Hungarian banks where plaintiffs' father maintained a safe deposit box.

15.     Defendant **Magyar Nemzeti Bank ("MNB")** is the government-owned national bank of Hungary. MNB received a substantial portion of the contents of bank accounts, safe deposit boxes and other spoliated banking assets of Hungarian Jews in the Greater Hungary annexed areas, including the banking assets of the Fischer family, either directly or indirectly. Indeed, in the area where the Fischer family lived and worked, there was located in Ujvidek a branch of defendant **MNB** established in 1941 for the express purpose of, among other things, controlling and/or receiving Jewish banking assets that had been wrongfully seized.

16.     The named defendants or their predecessors were all doing business in Hungary in 1944, and they served as the economic arm of the Hungarian Holocaust by stripping the Jewish population of their banking assets and thus depriving them of the means to flee and seek safety elsewhere. The defendant banks thus aided and abetted the Greater Hungary political arm that actually ordered and physically carried out the vast deportations of Hungarian Jews to Auschwitz. The defendant banks also engaged in a conspiracy to hide the assets that had been stolen from the Jewish population, including the Fischer family.

17.     This conspiracy by the defendant banks to hide and withhold information regarding the expoliated assets continues to the present day, and the defendant banks continue to be the custodians of the assets that were entrusted to them by Jewish customers, which was wrongfully taken from them in breach of the banks' fiduciary duties.

6

## JURISDICTION AND VENUE

18.    As to the plaintiffs who are citizens and residents of the United States, namely

**Paul (Chaim Shlomo) Fis**cher and **Aharon (Alex) Fischer,** this Court has subject matter

jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that customary international

law is a part of the federal common law, and plaintiffs' claims involve treaties to which

the United States is a party, as well as questions of federal and international law

generally.

19.    As to the remainder of the plaintiffs, who are non-U.S. citizens or residents, *i.e.*

aliens, this Court also has subject matter jurisdiction over this action pursuant to the

Alien Tort Statute, 28 U.S.C. § 1350, which permits aliens to bring tort claims in the

United States courts that are in violation of the law of nations (international law),

including the following:

(a) Convention on the Prevention and Punishment of the Crime of Genocide, 78 U.N.T.S.
277 (1948); entered into force for the United States Feb. 23, 1989;

(b) International Declaration Concerning the Laws and Customs of War, adopted by the
Conference of Brussels, Aug. 27, 1874, reprinted in 1907, 1 Am Jur. Int. L. Supp. 96;

(c) Convention (IV) Respecting the Laws and Customs of War on Land (1907), TS 403
BEVANS: 1 Bevans 247 ("Hague Convention"), entered into force for the United States,
36 Stat. 2277 (1911) (Article 46: "Private property cannot be confiscated");

(d) International Covenant on Civil and Political Rights, 993 U.N.T.S. 171 (December
16, 1976), entered into force for the United States June 8, 1992;

(e) Convention (IV) Relative to the Protection of Civilian Persons in Time of War, 75
U.N.T.S. 287, entered into force for the United States Feb. 2, 1956;

(f)The Universal Declaration of Human Rights, Adopted and proclaimed by General
Resolution 217 A (III) of 10 December 1948, Art. 17;

(g) Principles of International Law Recognized in the Charter of the Nuremberg Tribunal,
G.A. Res. 95(I) UN GAOR, 1st Sess., at 188, UN Doc. A/236 (1947);

7

(h) Protocol No. 1 to the European Convention on Human Rights and Fundamental Freedoms (Mar. 20. 1952, 213 U.N.T.S. 262, E.T.S. 9);

(i) Customary International Law; and

(j) Common law of the United States.

21.     Plaintiffs have been unable to determine the precise amount of the assets seized by the defendant banks, due primarily to the fact that defendants have hidden their records, denied that they have records relating the Fischer family claims, asserted privileges under various Hungarian secrets legislation and regulations, and shuffled the assets among themselves in a series of bank takeovers, mergers, assignments, and consolidations. However, Plaintiffs conservatively estimate their claims against the defendant banks, including the value of the bank accounts, contents of safe deposit boxes, loss of a mortgaged building, lost salary, pension and other employment benefits, at $38 million USD.

22.     Expropriation of private property without paying fair compensation by governments is itself a violation of international law and cannot affect the status of the Jewish assets in question. In <u>Republic of Austria v. Altmann</u>, 541 U.S. 677 (2004) the Supreme Court found that Austria's expropriation of private property sixty years ago was not only actionable in federal court as an exception to the Foreign Sovereign Immunities Act, but the nature of the wrongdoing was so clear that Austria could have had no legitimate expectation that it would be protected by the doctrine of sovereign immunity that was in place at the time it expropriated the property. The law is, therefore, clear that the private property of the Fischer family and other Hungarian Jews continues to belong to them no matter how many hands it has passed through.

23.     The defendant banks collectively have been and continue to be the custodians of the wealth stolen from the Fischer family that was entrusted to them in 1944. The Hungarian banking system was imposed upon each annexed territory concurrently with the annexation.

8

Both defendant **MNB** and the institute for financial affairs, the Penzintezeti Kozpont (which later merged into defendant **Erste**) were responsible for banking in this area of Greater Hungary.

24.     In the case of <u>Kiobel v. Royal Dutch Petroleum</u>, the issue of whether a corporation can be sued under the ATS is presently pending before the U.S. Supreme Court. In addition, the Supreme Court is also considering the issue of  "[w]hether and under what circumstances the Alien Tort Statute, 28 U.S.C. § 1350, allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States." <u>Kiobel v. Royal Dutch Petroleum Co.</u>, No. 10-1491, 2012 U.S. LEXIS 1998, at *270 (Mar. 5, 2012).

### Personal Jurisdiction

25.     This Court has personal jurisdiction over the defendant banks because they and their affiliates are engaged in regular and continuous business in this State, this District, and the United States generally, including the following banking activities in the United States:

(a) Buying and selling United States Treasury bills and bonds;

(b) Providing Hungarian currency to American banks and currency exchanges in the United States;

(c) Issuing letters of credit to Hungarian citizens to facilitate their commercial dealings in the United States;

(d) Financing commercial imports and exports between Hungary and the United States;

(e) Purchasing securities on the New York Stock Exchange and the American Stock Exchange for its own account and for its corporate and trust accounts;

(f) Buying and selling gold specie and gold futures on the Comex Exchange;

(g) Maintaining interest-bearing checking accounts and certificates of deposit in various United States banks;

(h) Subscribing to United States bank letters and financial reports;

(i) Selling Hungarian travelers' checks and American Express Travelers Checks to Hungarians who desire to visit the United States and cash their checks in the United States;

(j) Redeeming the travelers' checks of American banks and American Express Travelers Checks presented by American tourists to the defendant banks in Hungary; and

(k) Issuing and servicing credit cards for use in the United States and elsewhere.

## Venue

26.    Venue is appropriate pursuant to 28 U.S.C. § 1391(d) in that all of the defendant banks are aliens, who may be sued in any district.

## Forum Non Conveniens

27.    There is no international court or forum in which this case may be brought. For example, even though the International Court of Justice at The Hague accepts civil cases, only States may be parties to cases brought before that court.

28.    Hungarian courts are also not a viable available alternative, in that they would not provide plaintiffs with the due process of law and other fundamental rights recognized under international law. Hungarian courts have been uniformly hostile to cases involving Holocaust reparations, and have dismissed every such case that has been filed there over the past several decades. Therefore, to remit the present case to any Hungarian court would effectively deprive the plaintiffs, who are well advanced in years, of receiving any possible relief for their claims.

## Supplemental Jurisdiction

29.    This Court has supplemental jurisdiction in this case pursuant to 28 U.S.C. § 1367 and general principles of supplemental jurisdiction.

30.    Any U.S. court has jurisdiction for violations of international law for aiding and abetting, or complicity in, genocide. *See* Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980).

10

## EQUITABLE TOLLING AND ESTOPPEL

31.     Because the plaintiffs' assets were entrusted to the custodial care of the banks, the banks have a continuous duty to account for them or to turn them over to the owners or heirs. The defendant banks have been in continuous violation of their duty to return the plaintiffs' funds. Coupled with their repeated denials of information to plaintiffs, the defendants' actions constitute a deliberate, continuous, and ongoing violation of international law. There has, therefore, been no "last wrongful act" for the purpose of triggering any applicable statute of limitations.

32.     The plaintiffs, who are making claims for reparations in their capacity as heirs of their father, a Holocaust victim, were provided false information about the banks' violations and invasions of trust and custodial property, thus concealing from plaintiffs their right to know if they had inherited any assets. Since any alleged delay in bringing this action may be attributed to the fact that the information that plaintiffs sought was concealed and/or falsified by the defendants, the defendants should be equitably estopped from raising a statute of limitations defense.

33.     Among other things, defendants failed to conduct thorough searches for blocked bank accounts, sealed safe deposit boxes, or titles to property entrusted to defendants for safekeeping, and, in certain cases, falsely represented to plaintiffs that they had done so and that the result of their searches was negative. The defendant banks also represented to plaintiffs in certain instances that their banking assets had been taken by the German or Communist authorities when, in fact, such was not the case. For these reasons as well, defendant banks should be equitably estopped from raising a statute of limitations defense.

11

## STATEMENT OF FACTS

### The Hungarian Holocaust

34.     Although Hungarian Jews constituted only about 5% of the population of

Hungary,[1] they owned 20% to 25% of the assets in that country prior to the Holocaust.[2] On the

eve of the Holocaust in 1944, according to the Randolph Braham, author of the definitive history

of the Hungarian Holocaust, Jewish assets in Hungary had market value between 7 and 9 billion

gold Pengos.[3] A recent revaluation of Braham's calculations places the figure between 7 and 12

billion Pengos.[4] At the time, five Pengos were convertible into one U.S. dollar.

35.     Based on the nature of their business or profession, Hungarian Jews were much

more likely to use banking facilities than non-Jews in Hungary. In the professions, Jews made up

49% of the practicing attorneys, 55% of the physicians, 30% of the engineers, 60% of bank

officials, and 46% of salespersons. Jews owned 49% of metallurgical works, 42% of machine

manufacturing, 73% of clothes manufacturing, and 65% of the spinning and weaving industry. In

total, Hungarian Jews earned one-quarter of the national income of Hungary.[5]

36.     Among middle and upper-class Hungarian Jews, the largest proportion of their

individual assets consisted of equity ownership in real estate, both residential and commercial.

On information and belief, most of these properties were mortgaged, although some for only

modest amounts. The banks, as lenders, held the titles to these properties as collateral.

---

[1] The Hungarian census of 1930 reported 444,567 "Israelites" out of a total population of 8,668,319, making the Jewish population 5.1% of the total. But in 1938, Hungary, as an Axis power, increased its territory by annexing Carpatho-Ruthenia and northern Transylvania. Thus, by 1941, "Greater Hungary" held 725,000 Jews out of a population of 14,683,323, making the Jewish population 4.9% of the total. Gabor Kadar & Zoltan Vagi, Self-Financing Genocide: The Gold Train, the Becher Case and the Wealth of Hungarian Jews 10-12 (2004).

[2] Kadar & Vagi, at 26.

[3] 1 Braham, Politics of Genocide 554.

[4] Kadar & Vagi, at 25.

[5] Kadar & Vagi, at 22-26; 1 Randolph L. Braham, The Politics of Genocide: The Holocaust in Hungary 80 (1994).

12

37.     As was the case with all Hungarian banks, the defendant banks breached their fiduciary duty to the Fischer family and their other Jewish depositors by freezing and otherwise preventing their Jewish customers access to their assets on deposit with the defendant banks. By doing so, the banks conspired with the German authorities and their local puppet regimes to strip the Hungarian Jewish community of Greater Hungary of its assets, thus making it impossible for them to flee Hungary or otherwise avoid the round-ups and deportations to the death camps.

38.     For example, on March 20, 1944, all Hungarian banks, without notice, sealed the safe deposit boxes that had been leased to Jewish customers. That same day, Jewish bank account withdrawals were limited to 1000 Pengos (about $200) per person per day. On April 16, 1944, bank account withdrawals were further limited by the defendant banks to 1000 Pengos per person per month. In addition, the defendant banks sealed the safe deposit boxes of their Jewish clients, and later looted their contents.

39.     Also under a new Hungarian law, in March 1944, a special account was created in the Postatakarekpenztar, which was, upon information and belief, under the jurisdiction of defendant **Magyar Nemzeti Bank** ("**MNB**") in order to centralize and coordinate the looting of the funds from the frozen and spoliated bank accounts of Jewish customers, including the assets of the Fischer family.

40.     As of April 5, 1944 Jews were ordered to wear the yellow star.  On April 7, 1944 all Jews were forbidden to travel. On April 28, 1944 the round-up of Hungarian Jews began in the northern and eastern parts of Hungary, followed by the concentration of the Jews in the larger cities. During May 1944, all Jews were told to leave their residences and places of business, and were relocated to various buildings, camps, factories, or even open fields. Their residences, shops, and business offices were then occupied by new tenants if not commandeered by the

13

authorities, with the most desirable locations leased out to non-Jewish Hungarians who had

social or political influence. None of these changes in occupancy, however, involved the formal

transfer of title, which remained in the hands of the defendant banks holding the mortgages.

      41.     When the mortgage payments were not made because the borrowers had perished

in Auschwitz or elsewhere, the banks then foreclosed on the properties and sold them on the real

estate market, keeping the proceeds for themselves.

      42.     The Hungarian authorities knew that the best way to confiscate all Jewish

property was to dissuade Jews from hiding or burying their valuables. This approach also

facilitated the Germans' ability to deport 500,000 indigent Jews in record time. On April 1, 1944,

and days following, the Hungarian authorities issued a series of decrees that were tacked up on

Jewish residences. Jews were ordered not to leave their homes. They were ordered to establish a

Jewish Council. They were ordered to take their personal property and valuables to the nearest

Takarekpenztar bank or to the Hungarian National Bank, i.e. **MNB**. The bank officials

meticulously prepared descriptions of each item of property and gave a stamped copy back to the

depositor. Thus the Jewish population was lulled into believing that they could reclaim their

property at a future date—most likely when the war was over. However, the banks simply

burned their copies of the asset lists and commingled all the valuables, cash, securities, and other

assets into large packing boxes, later falsely claiming that the Communists had destroyed the

records. As for the copies of the asset deposits held by the deported Jewish population, these

were burned along with the clothes they were wearing when they arrived in Auschwitz.

      43.     During the Hungarian Holocaust, which lasted from March through October,

1944, a total of 437,000 Hungarian Jews from the countryside and another 50,000 from Budapest

were shipped to Auschwitz and other concentration camps. Even though some survived, virtually

all of the assets of the Hungarian Jewish community were either in bank accounts or safe deposit boxes held by the defendant banks, or found its way into the possession of the defendant banks after the mortgages held by those banks on Jewish-owned commercial and residential real estate were foreclosed upon. At the beginning of this period, the net value of Jewish assets in Hungary was between 7 and 12 billion Pengos. By the end, the net value of Jewish assets in Hungary was approximately zero.

44.     Typically, after the end of World War II, when Jewish survivors or their heirs returned to their family homes, they found strangers living there. When they enquired as to who now held the title to these homes, they were told by the occupants of the homes that they did not know the name of the owner or owners, but simply paid their monthly rent to the bank.

45.     Less than 2% of the estimated $2 billion in Hungarian victims' assets that were wrongfully taken have been restituted since World War II. Virtually all of the Hungarian victims who have attempted to recovery their money and valuables were informed that these assets no longer existed, without further explanation, and when the asked about the records of their accounts, they were told that such records had been "destroyed" and no longer existed.

### The Wrongful Taking of the Fischer Families Bank Assets

46.     As previously discussed, Plaintiffs' father owned and managed a bank in Peterreve, known at various times as the "Peterreve Hitelbank" (1941-1944) or the "Petroselska Kreditna Banka" (prior to 1941). After World War II, the bank was known as "Banka Kreditna Petrovo Selo," and is now part of defendant **Erste Bank Group.** This bank, which is located at 8 M. Tito Street (formerly 9 King Aleksandar Street), was established by Matyas Fischer in 1923 as a branch of the Novosadska Kreditna Banka in Novi Sad (originally "Novosadska Stedionica" and also known as the Ujvideki Hitelbank under the Hungarians. Plaintiffs' father maintained

both private family accounts and business accounts with this bank, which were confiscated in or about April 1941 following the German occupation. Plaintiffs' father also owned the building and surrounding property on which the bank was located, and this building and property was mortgaged as collateral for the establishment of the branch to the Novisadska Kreditna Bank (Ujvideki Hitelbank).

47.    Plaintiffs' father also had bank accounts with "Ujvideki Hitelbank" in Ujvidek, Greater Hungary, which is also now part of defendant **Erste**.

48.    In addition, as of December 1944, Plaintiffs' father had a safe deposit box containing foreign currency, gold and diamonds (box number 7A) at the Pesti Hazai Elso Takarekpenztar Bank in Budapest, which is now part of defendant **Erste**, but which the bank transferred after the father's deportation to Pesti Magyar Kereskedelmi Bank, also in Budapest, which is now owned by defendant Bayerische Landesbank Muchen, part of defendant **MKB Bayerische Landesbank.** This safe deposit box contained polished diamonds and gold coins (kronen). After Plaintiffs' father was deported in 1944, custody of the safe deposit box was transferred to the Pesti Magyar Kereskedelmi Bank, which is now part of defendant **MKB**, and operates under the name of Bayerische Landesbank Munchen MKB.

49.    When Plaintiffs and other members of the Fischer family returned to Petrovo Selo in the summer of 1945, and they all visited the bank location and another building that their father had owned and managed. This building and property had been mortgaged to the Novisadska Kreditna Banka (Ujvideki Hitelbank) as collateral to enable Plaintiffs' father to open a bank branch in Petrovo Selo. Upon their return, Plaintiffs found that the building had been completely ransacked, with only the tables, closets (empty), chairs and certain light fixtures remaining.

50.      Plaintiffs then went to Novi Sad and visited the Kreditna Bank, which was re-named as the "Privredna Banka Vojvodina." They were told by bank officials that they should not have returned, that they were supposed to be dead and that, therefore, they should cease their inquiries immediately.

51.      Stripped of all their assets, and utterly impoverished, the majority of the Plaintiffs and their mother immigrated to Palestine. Plaintiffs Paul (Chaim Shlomo) Fischer later relocated in the United States and became U.S. citizens. Plaintiff Alex (Aharon) Fischer left Europe in 1950 for the United States, where he became a citizen and has resided here ever since. Plaintiffs' mother passed away in Israel on July 7, 1969.

## CAUSES OF ACTION

## COUNT I: VIOLATIONS OF CUSTOMARY INTERNATIONAL LAW

52.      Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs above as though fully set forth herein.

53.      In 1944-1945 and all other relevant times thereafter, defendants acted in violation of customary international law  individually and in concert to convert  the plaintiffs' banking assets through, *inter alia*, the following actions:

      (a) stealing, looting and pillaging the assets that the plaintiffs had entrusted to them for safekeeping under their custodial and fiduciary duties;

      (b) depriving the plaintiffs of the value of those assets;

      (c) facilitating the Hungarian Holocaust by freezing the monies and assets of the plaintiffs so that they were unable to escape from Hungary; and

      (d) discriminating against the plaintiffs on the basis of their Jewish religion by singling out their property and that of other Jewish customers for seizure from 1938, and thus long before any German presence.

55.    Moreover, defendants' violations of international law continued after 1945 and until the present day through the following actions:

(a) unlawfully refusing to return the looted assets to the plaintiffs;

(b) lying to the plaintiffs that they had not taken the assets;

(c) intentionally and wrongfully concealing books and records of the custodial assets;

(d) enriching themselves with the derivative profits of such assets;

(e) investing and otherwise profiting from the looted assets on a continuing basis;

(f) denying that they knew the amounts or existence of the looted assets;

(g) failing to provide an accounting of the plaintiffs' accounts; and

(h) failing to restitute the assets to the plaintiffs.

56.    Defendants' actions were in violation of the following treaties, international declarations and conventions, which together reflect generally accepted principles of international law, and constitute part of the law of the United States:

(a) Convention on the Prevention and Punishment of the Crime of Genocide, 78 U.N.T.S. 277 (1948); entered into force for the United States Feb. 23, 1989;

(b) International Declaration Concerning the Laws and Customs of War, adopted by the Conference of Brussels, Aug. 27, 1874, reprinted in 1907, 1 Am Jur. Int. L. Supp. 96;

(c) Convention (IV) Respecting the Laws and Customs of War on Land (1907), TS 403 BEVANS: 1 Bevans 247 ("Hague Convention"), entered into force for the United States, 36 Stat. 2277 (1911) (Article 46: "Private property cannot be confiscated");

(d) International Covenant on Civil and Political Rights, 993 U.N.T.S. 171 (December 16, 1976), entered into force for the United States June 8, 1992;

(e) Convention (IV) Relative to the Protection of Civilian Persons in Time of War, 75 U.N.T.S. 287, entered into force for the United States Feb. 2, 1956;

(f)The Universal Declaration of Human Rights, Adopted and proclaimed by General Resolution 217 A (III) of 10 December 1948, Art. 17;

18

(g) Principles of International Law Recognized in the Charter of the Nuremberg Tribunal, G.A. Res. 95(I) UN GAOR, 1st Sess., at 188, UN Doc. A/236 (1947);

(h) Protocol No. 1 to the European Convention on Human Rights and Fundamental Freedoms (Mar. 20. 1952, 213 U.N.T.S. 262, E.T.S. 9);

(i) Customary International Law; and

(j) Common law of the United States.

57.     Plaintiffs have been injured and have suffered damages a result of the defendants' wrongful actions, and therefore the plaintiffs demand all relief and remedies available to them under the applicable principles of customary international law, jointly and severally against all defendants in an amount to be determined at trial, plus compound interest since 1944, together with the costs of this action. Plaintiffs also demand exemplary or punitive damages in an amount and manner to be determined at trial.

## COUNT II: AIDING, ABETTING,FACILITATING AND CONSPIRING TO COMMIT GENOCIDE

58. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs above as though fully set forth herein.

59. Under 18 U.S.C. § 1091, genocide is defined in pertinent part as:

> Whoever, whether in time of peace or in time of war and with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group as such …(4) subjects the group to conditions of life that are intended to cause the physical destruction of the group in whole or in part.

60.     By their actions, the defendant banks aided, abetted, facilitated and conspired with the German authorities to carry out the Hungarian Holocaust of 1944 by freezing and looting the banking assets that plaintiffs had entrusted to them for safekeeping under custodial duty even before the arrival of any German authorities in the area, thus ensuring the physical destruction of most of the Jewish community in Hungary and making it impossible for the Plaintiffs and other

19

survivors and heirs of the victims of the Holocaust to ever return to their homes and businesses in Greater Hungary.

61. Both private actors, such as the defendant banks, as well as those state actors acting under color of law may be liable for violations of international law under the ATS. *See* Kadic v. Karadzic, 70 F.3d 232, 239 (2d Cir. 1995) (quoting Restatement (Third) of the Foreign Relations Law, §§ 404, 702); *see also* In re South African Apartheid Litigation, 617 F. Supp. 2d 228, 248 (S.D.N.Y. 2009).

62. In order to aid and abet an international law violation, the aider and abettor need only provide "practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime." Mehinovic v. Vuckovic, 198 F. Supp. 2d 1322, 1356 (N.D.Ga. 2002) (quoting Prosecutor v. Furundzija, Case No. IT-95-17/1/T, judgment,¶¶ 192-249 (ICTY Trial Chamber, Dec. 10, 1998). [6] See also In re South African Apartheid Litigation, 617 F. Supp. 2d at 257, quoting Khulumani v. Barclay National Bank Ltd., 504 F.3d 254, 277 (2d Cir. 2007). The assistance having a substantial effect "need not constitute an indispensable element," and an accessory may be found liable even if the crimes could have been carried out through different means. In re South African Apartheid Litigation, 616 F. Supp.2d at 258-259.

63. In his concurring opinion in Khulumani, Judge Katzmann interpreted the Rome Statute standard as providing "that a defendant may be held liable under international law for aiding and abetting the violation of that law by another when the defendant (1) provides practical

---

[6] In another international law case, the Zyklon B Case, 1 Law Reports of Trials of War Criminals 93-103 (1947), the Tribunal found that Bruno Tesch, the owner of the firm that had manufactured and sold the poison gas used in the gas chambers in Nazi concentration camps, knowing its intended use, guilty of aiding and abetting crimes against humanity. Similarly, the Rome Statute, which established the International Criminal Court (at art. 25(c), notes that "providing the means for [a crime's] commission" is one example of aiding, abetting, or otherwise assisting a violation of the law of nations. *See* In re South African Apartheid Litigation, 617 F. Supp. 2d at 258 n. 158. Under the Rome Statute, the aider or abettor may be held liable if he or she is aware that the assistance provided will substantially assist the commission of the crime. *Id.*

assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime." *Id.* at 277. The Second Circuit adopted this as the ATS standard, finding that "there is a sufficient international consensus for imposing liability on individuals who purposely aid and abet a violation of international law." Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F. 3d 244, 259 (2d Cir. 2009).

64.     In Lev v. Arab Bank, 2010 WL 623636 (E.D.N.Y. 2010), the district court denied the motion to dismiss an ATS claim, finding that the complaint sufficiently alleged that that the bank had "knowingly and intentionally participated in the [enterprise's] illegal goals." *Id.*[7]

65.     Similarly, in this case, the bank defendants did far more than provide "routine services." Instead, it is alleged that the bank defendants facilitated the international law violations committed directly by the Nazi authorities by freezing and looting the banking assets of that plaintiffs had entrusted to them, and then, after the end of World War II, covering up their misdeeds by destroying relevant records and/or not taking all prudent and necessary steps to trace the spoliated assets and return them to their rightful owners.

66.     As a result of the foregoing, plaintiffs are entitled to an award of damages against the defendants in an amount to be determined at trial.

### COUNT III:  UNJUST ENRICHMENT IN VIOLATION OF GENERAL PRINCIPLES OF INTERNATIONAL LAW

67.     Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs above as though fully set forth herein.

---

[7] The court further found that "Plaintiffs' plausible factual allegations here permit the reasonable inference that Arab Bank was not merely the indifferent provider of 'routine banking services' to terrorist organizations, but instead purposefully aided their violations of international law." *Id.* Finally, in the Arab Bank case, the court noted that the bar is set fairly low for a plaintiff responding to a motion to dismiss. *Id.* ("a plaintiff may survive a motion to dismiss by making sufficient, plausible allegations to permit such an inference [*i.e.*, intent to aid and abet]. *Id.*

68.     The prohibition against unjust enrichment can be found in each and every nation's legal system. Whether by statute or by common law, restitution for unjust enrichment is universally recognized as a remedy for the wrongful taking of private property. Through the operation of "general principles of international law" found in Article 38 of the Statute of the International Court of Justice, unjust enrichment is incorporated into the corpus of customary international law. The United States has signed and ratified the Statute of the International Court of Justice, and therefore the prohibition against unjust enrichment is part of the supreme law of the land in addition to being a rule of customary international law. See Article 38, Statute of the International Court of Justice, United States Treaty Series 993, 59 Stat. 1031 (1945). Defendants have been unjustly enriched to the detriment of the plaintiffs as a result of their wrongful confiscation of plaintiffs' bank accounts, deposit monies, and contents of safe deposit boxes.

70.     Defendants have been unjustly enriched to the detriment of the plaintiffs by hiding and concealing the plaintiffs' assets and falsely denying that they had taken those assets.

71.     Equity demands that the defendants be disgorged of their stolen assets and that restitution be made to the plaintiffs.

72.     Plaintiffs are entitled to entitled to monetary damages in an amount determined at trial, as well as a constructive trust so that the monies and other assets unjustly taken by the defendants, plus interest and a reasonable investment return, may be equitably restored to them.

### COUNT IV: <u>UNJUST ENRICHMENT (COMMON LAW)</u>

73.     Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs above as though fully set forth herein.

74.     By their seizure of plaintiffs' assets, and by their refusal and/or failure to return these Looted Assets to their rightful owners or their heirs, defendants were unjustly enriched under common law principles and New York law.

75.     Defendants have wrongfully obtained a financial windfall at plaintiffs' expense by wrongfully retaining plaintiffs' Looted Assets and the accumulated interest and investment returns of said assets for over 55 years.

76.     Plaintiffs are, therefore, entitled to the imposition of a constructive trust and compensatory and punitive damages in an amount to be determined at trial, but not less than $38 million USD.

## COUNT V: <u>CONVERSION</u>

77.     Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs above as though fully set forth herein.

78.     Defendants' wrongful taking, retention and exercise of the right of ownership over the Looted Assets without justification was inconsistent with plaintiffs' rights, and constituted a conversion.

79.     As a result of said conversion, plaintiffs are entitled to the return of the Looted Assets, as well as damages to be determined at trial.

## COUNT VI: <u>BREACH OF FIDUCIARY AND SPECIAL DUTY</u>

80.     Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs above as though fully set forth herein.

81.     Defendants had a special duty and obligati8on to plaintiffs to hold and maintain their father's personal and business accounts and safe deposit assets with the utmost care for the account holder and his family.

23

82.     Defendants breached their special duty to plaintiffs by, inter alia, (a) seizing, blocking and disposing of plaintiffs' assets in a manner inconsistent with their obligation to manage those funds in the best interests of the plaintiffs, and (b) after World War II, failing to conduct a full and accurate accounting of all Looted Assets and failing to return such assets to plaintiffs as their rightful owners.

83.     As a result, plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

## COUNT VII: ACCOUNTING

84.     Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs above as though fully set forth herein.

85.     At all relevant times, the defendant banks were obligated to retain and hold the accounts and other assets of plaintiffs in trust with the highest degree of care.

86.     Moreover, during World War II, from the moment that the anti-semitic blocking laws and banking restrictions began to be applied to plaintiffs and other Jewish depositors, the defendant banks accepted a *de facto* legal role as trustees of the sequestered accounts and safe deposit assets.

87.     The defendant banks have failed to return plaintiffs' Looted Assets to their rightful owners and have failed to provide relevant information or to make records available to plaintiffs regarding the current location and/or status of their wrongfully taken banking assets that had been entrusted to them. Nor have the defendant banks provided an explanation for their unjustified retention of those assets and non-disclosure of records pertaining to them.

88.     An accounting is necessary to determine the rights of plaintiffs since the defendant banks are in the best position to provide the relevant information regarding plaintiffs'

24

Looted Asses, especially since many of the relevant records that plaintiffs' father once possessed relating to his banking assets were destroyed during the Hungarian Holocaust.

89.     At all relevant times, plaintiffs had and continue to have legal and equitable interest in the Looted Assets, and have at no time been lawfully deprived of such interest in any manner that conforms with minimal requirements of due process of law. Further, plaintiffs at no time voluntarily ceased to be account holders or voluntarily surrendered or relinquished their accounts or safe deposit box assets to any third party or defendant and, therefore, retain sufficient interest as owners of those accounts to demand a full explanation and accounting as to their current status or disposition.

## DEMAND FOR TRIAL

90.     Plaintiffs demand a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(a) Award plaintiffs compensatory damages against the defendants jointly and severally in an amount to be determined at trial, with interest from April 1944 to the present to the full extent allowed by law;

(b) Award plaintiffs punitive damages in an amount to be determined at trial;

(c) Direct that Defendants return to plaintiffs all of the Looted Assets that they are still within their custody and control, with interest and/or an appropriate return on investment;

(d) Direct that Defendants conduct an Accounting of the Looted Assets;

(e) Impose a Constructive Trust on defendants with regard to plaintiffs' Looted Assets;

(f) Award plaintiffs the costs of bringing this action and reasonable attorneys' fees; and

(g) Grant such other relief as the Court deems just and proper.

25

Dated: July 5, 2012

Respectfully submitted,

McCALLION & ASSOCIATES LLP

By: _____
Kenneth F. McCallion (KFM 1591)
100 Park Avenue – 16th floor
New York, New York 10017
Attorneys for Plaintiffs

26